NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 28, 2018
Decided April 23, 2018

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 17-2221

| | |
|---|---|
| SAMMIE RAINEY, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 16 CV 6358 |
| NANCY BERRYHILL, | |
| Deputy Commissioner for Operations, | Michael T. Mason, |
| Social Security Administration, | *Magistrate Judge*. |
| *Defendant-Appellee.* | |

**O R D E R**

Sammie Rainey applied for Supplemental Security Income and Disability Insurance Benefits because of complications related to strokes he suffered in 2009 and 2011. An Administrative Law Judge found that Rainey was severely impaired by his stroke-related impediments and hypertension, but concluded that these impairments were not disabling. The Appeals Council denied review, and a magistrate judge, presiding by consent, upheld the ALJ's decision. We conclude that the case must be returned to the agency for further proceedings because the ALJ erred in discrediting

Rainey's testimony, in assessing Rainey's residual functioning capacity, and in finding that Rainey was able to do past work.

## I. Background

Sammie Rainey drove a bus for the Chicago Transit Authority until September 2011, when he suffered a stroke. He spent four days in the hospital and was discharged with a prescription for a cane. The CTA later informed him that "they couldn't use [him] any more," an explanation that he attributed to his stroke. Rainey, who by this time was 58 years old and had worked as a bus driver for 11 years, fell just short of qualifying for the CTA's 12-year requirement to receive a full pension. A few months later he became homeless.

Rainey's 2011 stroke was his second in two years. After that stroke he underwent an MRI of his brain, which revealed an acute infarct[1] in one section, and an old infarct in another. Since the second stroke, Rainey has had persistent weakness on his right side and trouble with his balance, which has resulted in some slip-and-fall accidents. He limps when he walks and continues to depend on his cane for balance. To control his high blood pressure, he takes both prescription medication and aspirin, and watches his diet.

Several of Rainey's doctors noted his dependence on a cane when walking. Dr. Gregorio Rosenstein, who specializes in internal medicine, started treating Rainey when he was first admitted to the hospital in 2011, and has examined him several times since. The progress notes from Dr. Rosenstein's 2014 examination indicate that Rainey continues to have weakness on his right side and needs a cane to walk. In 2012 Rainey also saw internist Sophia Chin twice for help controlling his blood pressure. Her reports from October and November 2012 indicated that Rainey has a "normal gait" but "walks with a cane." In February and April 2012, in connection with Rainey's application for benefits, non-examining state-agency consultants determined that Rainey had the residual functioning capacity to perform light work. They noted his poor balance and need to walk with a cane, but concluded that he had no other work-related limitations.

Dr. Fauzia Rana, an internal medicine consultative examiner, examined Rainey in April 2012, and concluded that he could sit, stand, walk, lift, carry, and hear without

---

[1] An "infarct" refers to an area of tissue that dies due to a sudden insufficiency of blood supply. LIPPINCOTT WILLIAMS & WILKINS, STEDMAN'S MEDICAL DICTIONARY 968 (28th ed. 2006).

difficulty. She added that Rainey had no "need/use of assistive device," despite noting earlier in the report that he "feels off balance" and "uses a cane most of the time."

At his hearing before the ALJ in May 2014, Rainey testified about his physical limitations. He explained that because he is right-handed, his right-side weakness meant that he had to take more time doing daily activities like dressing and undressing. He said that he tried to exercise every day by walking half a block with his cane, but needed someone to assist him when he went grocery shopping. Regarding his pre-CTA work history, Rainey mentioned that he once worked as a postal mail handler and a switchboard operator. He testified that he no longer could work as a switchboard operator because he could not use his right hand to type and he was never trained to operate the digital telephone system in use today.

Also at the hearing, medical expert Dr. Hugh Savage, another internist who had reviewed Rainey's files, asked Rainey questions relating to his ability to perform light work. Right away the doctor observed that Rainey appeared to lean heavily on his cane, an observation that drew a sharp rebuke from the ALJ:

> [Dr. Savage]: - - I notice that you're quite dependent on the cane when you walked in, and I noticed that your - - it appears to be necessary, almost - -
>
> ALJ: Ask a question.

Dr. Savage then asked Rainey to specify when the weakness and pain had worsened to the point that he had become so dependent on his cane, to which Rainey replied, "When I got out of the hospital." Dr. Savage went on to address Dr. Rana's consultative exam, remarking that he was "extremely impressed" that Rainey could walk on his toes and heels and tandem walk, as Dr. Rana had noted. Dr. Savage also highlighted Dr. Rana's observations that Rainey had only "very mild reduction" in right arm strength, no reduction in grip strength, and a gait that was "normal without a limp or staggering." The weight of the evidence, Dr. Savage concluded, showed that Rainey had a residual functional capacity to perform light work.

A vocational expert testified in more detail to Rainey's work-related capabilities. He opined that Rainey could perform his past receptionist work with the residual functional capacity described by the ALJ: being able occasionally to lift and carry 20 pounds, and frequently 10; able to sit for 6 hours of an 8-hour day with customary breaks; able to stand and walk for up to 6 hours in an 8-hour day with customary breaks; able to frequently climb short stairs or ramps, stoop, crouch, kneel, crawl,

balance, but not work on ladders, ropes or scaffolding; and needing to avoid concentrated exposure to hazards, specifically unprotected heights and moving machinery.

The ALJ applied the 5-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Rainey was not disabled. At Step 1, the ALJ determined that Rainey had not engaged in substantial gainful activity since his alleged onset in September 2011. At Step 2, the ALJ identified Rainey's severe impairments as "status-post two cerebrovascular accidents, in 2009 and 2011, and hypertension." And at Step 3, the ALJ concluded that these impairments, individually or in combination, did not satisfy a listing for presumptive disability.

In assessing Rainey's RFC, the ALJ found that Rainey's impairments could reasonably be expected to cause the alleged symptoms, but his testimony concerning the limiting effects of these symptoms was "not entirely credible" because (1) the examinations performed by Dr. Rana and Dr. Chin indicated that he did not actually need a cane to walk, and (2) Rainey's reported activities of daily living did not support his allegations of significant neurologic impairment. The ALJ concluded that Rainey had the RFC to perform light work with the following restrictions: no climbing ladders, ropes, or scaffolds; avoid concentrated exposure to workplace hazards such as unprotected heights or moving machinery; and no working on uneven or rough surfaces. At Step 4 of the analysis, the ALJ found that Rainey could perform his past relevant work as a "receptionist"—the job title that the vocational expert found to most resemble his previous switchboard operator job.

## II. Discussion

On appeal Rainey argues that the ALJ erred in finding his testimony not entirely credible because the ALJ made impermissible inferences and misconstrued the medical evidence. First, Rainey argues, the ALJ improperly relied upon minor facts—his ability to, for instance, use a stove, take public transportation, and shop (with a friend's assistance)—to conclude that he would be able to perform full-time work. And second, the ALJ wrongly asserted that the reports from Dr. Rana and Dr. Chin showed that a cane was not medically necessary; their reports, Rainey contends, said only that he had a normal gait and that he could walk 50 feet without a cane.

We agree with Rainey that the ALJ did not adequately justify his credibility finding. While an ALJ may consider daily activities when assessing the claimant's credibility, *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011), the ALJ must also explain

how the claimant's activities are inconsistent with medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Using a stove or public transit does not necessarily require a lot of walking, and Rainey testified that he does need a friend to accompany him while shopping. Moreover, the ALJ failed to credit Rainey for having a long and constant work history. *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). The ALJ's flawed credibility assessment warrants remand. *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

The ALJ also made no effort to "build an accurate and logical bridge," *see Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014), between what Dr. Chin and Dr. Rana wrote in their reports and his conclusion that Rainey was not actually reliant on his cane. Dr. Rana stated in her report that Rainey could walk on his toes and heels, but she did not state that he could walk at a normal pace, for long distances, or for long amounts of time. Anyway, the ALJ accorded Dr. Rana's opinion only "slight weight" because he found that Rainey's more recent medical records "showed that the claimant's impairments caused limitations greater than to which Dr. Rana opined." The ALJ also put too much weight on Dr. Chin's perfunctory notation that Rainey walked with a "normal gait," given that her report focused on Rainey's routine health maintenance, not his physical abilities.

Rainey also argues that the ALJ's RFC assessment is unsupported by the record. Rainey contends that the ALJ made a "tremendous leap" in extrapolating from Dr. Rana's bare notation—that he could walk more than 50 feet without a cane—the conclusion that he could stand and walk unassisted for six of eight hours in a work day. Rainey faults the ALJ for discrediting his testimony and for failing to give sufficient weight to the 2014 examination by Dr. Rosenstein, whom Rainey regards as a treating physician based on his ongoing care from 2011 to 2014. *See* 20 C.F.R. § 404.1527 (the Administration may consider a "treating source" to be a medical source "who has treated or evaluated [the claimant] only a few times or only after long intervals" as long as "the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)").

While it is true that an ALJ can give less weight to a treating source's opinion[2] if it is inconsistent with the record, *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir.

---

[2] New regulations eliminated the treating physician rule last year, *see* 20 C.F.R. § 404.1520c, but the rule is effective only for claims filed after March 27, 2017, and thus

2017), the evidence of inconsistences relied upon by the ALJ here is not persuasive. The ALJ does not explain why he discounted Dr. Rosenstein's opinion, and he fails to address the factors identified by the regulations to determine how much weight to give a treating physician's opinion. *See* 20 C.F.R. § 404.1527(c)(2)-(5) (stating relevant factors include whether medical source examined claimant, length of treatment relationship, medical source's expertise, the opinion's consistency with the record, and evidence the medical source provides supporting their opinion). For example, the ALJ did not acknowledge that Dr. Rosenstein's 2014 exam was the most recent medical record in Rainey's file, or that it corroborated Rainey's account of his walking difficulties.

Finally, Rainey challenges the ALJ's finding that he could perform his past work as a switchboard operator, which, he maintains, did not match the job description of "receptionist"—the classification that the vocational expert applied to his past work. According to the Dictionary of Occupational Titles, receptionist work involves tasks like typing memos, reports, and other documents, as well as collecting and distributing mail and messages—activities that his switchboard job never entailed. Further, the ALJ failed to do a function-by-function analysis of Rainey's past relevant work. *See Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991) (concluding that ALJs must list specific physical requirements of claimant's past job to assess claimant's current ability to perform the same tasks). Such an analysis would have revealed that Rainey lacked both the requisite keyboarding skills and walking ability to perform the switchboard job. *See* S.S.R. 82–62 ("In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings … [a] finding of fact as to the physical and mental demands of the past job/occupation.").

The ALJ's flawed finding that Rainey could perform past relevant work was not harmless because it meant that the ALJ did not proceed to Step 5, at which point Rainey would have been found presumptively disabled under the agency's medical vocational guidelines.[3] *See* 20 C.F.R. Pt. 404, Subpart P, App. 2, § 200.00 et seq. Rainey, who was over 55 when he applied for benefits and therefore at "advanced age," would be

---

does not apply to this case. For claims like Rainey's that were filed before March 27, 2017, the rules in § 404.1527 continue to apply.

[3] The medical-vocational guidelines or "grids" are matrices of the "four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983).

presumptively disabled under the grids if the ALJ also found that he could not perform past relevant work and was restricted to sedentary work. 20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.00(d).

Accordingly, we REVERSE the decision upholding the ALJ's denial of benefits and REMAND to the agency for further proceedings.